Case No. 15-1113NL, ARC Bridges, Inc. Petitioner v. National Labor Relations Board Mr. Haley for the petition, Ms. Ginn for the respondent Good morning. Ray Haley representing ARC Bridges. May it please the Court, Counsel, preliminarily I need to bring the Court's attention to an error in our reply brief. On page 12, the sixth line of text from the top, 2007, as reported in the brief should be 2008. My apologies. This case returns to this Court following a grant of ARC Bridges' petition for review in December of 2011, while remanding to the Board for consideration under a different theory. When first decided by the Board, the matter of a July 2007 wage increase for newly represented workers was found to be inherently destructive by the Board of Employee Section 7 rights on the basis of what the Board concluded to be an established practice of adjusting was found to be insufficient by a different panel of this Court, and in connection with that and in relation to a footnote where the Board panel indicated they would still find a violation of Section 8A3 discrimination, was remanded to the Board for consideration. This, following this Court's remand, the Board finally decided the case on March 31st, 2015, more than three years later. We believe and urge that the supplemental decision and order should not be enforced because it's based upon factual findings unsupported in the record, in many cases sheer speculation, and it ignores established Board precedent in connection with balancing the obligation to bargain in good faith under Section 8A5 with discrimination, which means nothing more than different treatment as long as it's not based upon anti-union animus. In this particular case, just a brief summary of the facts may be in order if the Court would like to hear them, but there's a series of events that shows the differential treatment to be something far less than what has been urged by the Board in its decision. That's been established in the previous decision of this Court. Well, it has been established in the previous decision. The point I'm trying to make, Your Honor, Judge Ginsburg, is that when we get down to what the difference really is in this case is a 3% increase that was extended to unrepresented employees in October 2007, made retroactive to July of 2007, and at the bargaining table in March of 2008, after 2% retroactive had been offered to the represented employees amongst a panoply of additional economic demands, the union spokesperson at the table, unrebutted in the record, said, you owe us 3%. At that point, he was asked, is that your offer? He said, that's our offer and then some. So at that particular point in time, the union confirmed, March 2008, that 2% in wages was part of their demand and 3% budget authority was all that Crisprol had, which is, of course, the basis of the claim that it all should have gone to wages. Now what the Board would have us do in this particular circumstance is go to the union and say, here's 3% for wages. At the outset of the negotiations, not necessarily the outset, but in July of 2007 after negotiations had been underway at some point in time, for some period of time, pardon me. And then following that, say, we have no more. We don't want to talk about anything else that you have on the table. And it's been established here that the union's demands with first year cost increases, just for the first year of bargaining for a contract, were in excess of $4 million against a revenue stream of $16 million. A publicly funded and charitably funded organization. We can't raise prices to meet demands. This is what we've got. Now that's not to say that we don't have some problems in this case. Clearly we had, forgive the term, two Lone Rangers out speaking out of school. One, Ray couldn't keep his mouth shut, but he nevertheless couldn't resist speaking to people around him. Bonnie Groenendijk, who was instructed how to respond to questions about wage increases from outside consultants, that was discredited by, not discredited, but the judge, the Administrative Law Judge, and now the Board, credits the testimony of Shirley Bullock. But our position with respect to that is none of those statements. For all we know, what was allegedly said by these people, what the ALJ characterized in one circumstance involving Teresa Pendleton as testimony that makes little sense when viewed by itself. But even if all those things are true, there's no connection of the dots back to Chris Prohl, who was the sole decision maker with regard to bargaining strategy. Well, what about, we have case law which says that high level, statements by high level employees can be attributable to the decision maker. I'm sorry, Your Honor, I didn't... I said, we have, I'm sorry, we have case law, Board law, that statements by high level employees can be attributed to, back to Prohl, and what about that? Well, Your Honor, in connection with this particular circumstance, there's no evidence apart from these two statements. There's no what? There's no evidence apart from these two statements of anti-union analysts. Well, that's a different argument. You say they can't be given any weight at all because they weren't made by Prohl. I asked you whether or not, as high level employees, they can be attributed to the company. Well, yes, Your Honor. Agents and supervisors all the way down to first level supervisors can engage in misconduct for which the company will be held responsible. There's no question about that. And in this particular case, as the judge observed, these statements would be in violation of Section 8A1, Interference, Restraint, and Coercion of Employees in the Exercise of Section 7 Rights. We do not dispute that. The Board did not allege in the complaint that was issued against Art Bridges any independent 8A1 violations. As a consequence of that, there's nothing really to address in connection with those statements. I agree wholeheartedly. I'm sorry if I misunderstood your question. There's also case law that in the small shop sort of situation that knowledge as to protected activity can be imputed to the organization just simply by word of mouth. But that doctrine does not apply in connection with anti-union animus as a substantial motivating factor. Court of Isaac, Proe was going to give us a raise until we voted a union. So why isn't that probative of anti-union animus in this case? Well, it's a questionable statement. It would be if it were accurate. And it would be with respect to Bonnie Groenendijk if she had said that. There is some question as to whether or not she said that. What did the Board, didn't the ALJ credit? The ALJ found that she said that. That's true. Okay, so I mean, when's the last time we overturned an ALJ credibility determination? Star drywall makes it virtually impossible, Your Honor, and that's why I didn't try and do it. But I would direct your attention to the dissent of Member Miskimara who observes quite plainly that the statement at the time it was made makes no sense in view of the union having been voted in in November of 2006 and in February of 2007 and budget authority only having been obtained in June of 2007. It's a made-up statement to the extent Bonnie Groenendijk made that statement. Just in thinking about this issue, it's hard to figure out, given Shell Oil, how you ferret out anti-union animus because Shell Oil allows the employer to give the unrepresented employees a raise, and I'm trying to figure out how. When you do that in the context of a union negotiation, it's always going to look a little suspicious. It's always going to look suspicious. That's correct. And you're going to have some indicia, I guess, of anti-union animus from individuals making statements that are imperfect descriptions of the process that you're in, and there's with regard to the imperfect statements of Bonnie Groenendijk. If you look at the footnote in his opinion, the union being there means that we just can't act unilaterally. And the union at this time could, and in fact was, seeking raises substantially more than that, correct? Substantially more, all the way through the date of the hearing before the ALJ. They had not withdrawn or reduced in any significant manner their demands for 20%, 20%, and 10% over the life of the three-year contract. They wanted that increase retroactive as well, back to the dates of certification. So they wanted more by virtue of that demand than what the unrepresented folks were afforded, even with the so-called extraordinary, if you will, lump sum payment. At the time, and just so my chronology is correct, at the time the raise was given to the unrepresented employees, it was still uncertain what was going to be the outcome of the negotiations, obviously. There's no question about that. There's no allegation of bad faith bargaining in this particular case. So the board has, even though the charge initially had an 885 allegation, conduct at the bargaining table and how we made our proposals and how we negotiated with the unions really not at issue. The board just believes that we should have somehow, some way, given that the bargaining unit employs 3% at the outset or at early stages of these negotiations, or said 3%, that's all you get. Now, I would remind the court of one other thing in this particular case. The best statement of what the motivation was, was the inclusion within the checks announcing to the unrepresented folks of Chris Prohl and her basis for having decided to go ahead and extend that wage increase to those folks, announcing as well to those folks to keep it quiet, but additionally pointing out to them that it's because the union has not prioritized its demands. Reminding the court again, something that's not very important to the board, but I think in terms of the collective bargaining process, it's something that can't be overlooked. When we received the union's demands, the very next day we provided them with a wealth of information. In response to their request to open our books, we agreed to do that to show them that there was financial impossibility to meet those demands. And they took the statements across the bargaining table, put them in the flyers, saying the company spokesperson, which of course I take umbrage at because that was me, asked for the one or two items that were most important to you, and they would see what they could do in those areas, which of course is precisely what happened. Discussions across the table necessarily will become more circumspect from that point on, but it doesn't mean we didn't make the proposals, and I'm well over my time. Thank you so very much. Thank you. Good morning. Pardon me. Good morning. Amy Ginn for the NLRB. This is a case about motive, and as this court is well aware, substantial deference is given to the board's conclusion of the discriminatory motive, which in this case is based not only on the statements made by Manager Gronendijk and Supervisor Taso, but also to protectual reasons given by Pearl herself for the decision, and the delay in the wage increase making it retroactive at the end of the certification year. At the risk of asking you to repeat part of that, I want to keep as clearly in mind as I can what it is that the board now says was done with anti-union animus. Withholding the wage increase that was given to unrepresented employees from the represented employees in October of 2007. Since we've earlier determined that that was not a departure from an established practice of term and condition of employment, why is that still at issue? Okay. So it was previously determined that the withholding of the wage increase was not inherently destructive of employee rights because it was not an established term and condition of employment. The court then remanded to the board for determination under right line whether it was nonetheless still a violation of Section 883 because it was done with an unlawful motive. So the first time this case came before the court, motive was not an issue in the case at that time. It was litigated before the judge as a motive case or a right line case, and therefore on remand this court specifically said that the board should apply right line and the discriminatory motive test to determine whether our court's actions in this case violated the act. The board then took position statements from the parties and made exactly that determination. In this context, with Shell Oil allowing the employer to give raises to the unrepresented employees, it's always, as I said to your opposing counsel, going to look a bit suspicious. And so trying to ferret out when it's done with anti-union animus is very challenging, but it seems odd to call it anti-union animus when the raise itself is the subject or how much of a raise, if any, they give is the subject of the bargaining going on simultaneously between the union and the employer. In fact, the union was seeking far more than 3%, correct? That's correct. The union had made a proposal seeking more. So it just seems odd to call what happened. Let's put aside the statements for a second because we'll get into those. But just the basics of this, yeah, it looks suspicious, but on the other hand, that's what they're bargaining about, and they could have ended up with a 5% raise, and then the unrepresented employees would look and think, well, we've got a raw deal, right? And it just seems it would be different, it seems to me, if the employer were giving to the unrepresented employees something that the union employees, the represented employees, could not get through bargaining, some kind of benefit. I don't know what that would be, but some kind of thing that they could not obtain through bargaining. But if it's the subject of bargaining, I'm having a little trouble seeing how you even think of this as anti-union animus. And there are always going to be statements going on during the bargaining process, as you're aware, that can be connected up. Right. There may be statements at the bargaining table. There may be hard bargaining going on. I think looking at some of the shallow oil cases could be instructive here. So if you look, for example, and these are in the briefing, at Peabody Coal, where there were a couple of different allegations in that case, and it involved bargaining over wage increases. In one instance, there was an 85 allegation that was dismissed, so there was no problem with the bargaining in that case. However, the board and then the Sixth Circuit went on to enforce a fining of an 83 violation because the withholding of the increase there from the represented employees was found to have been done out of animus. Here they couldn't, just so I'm clear on this, they could not give the raise unilaterally to the represented employees, correct? Actually, the board in this case said that that's not correct. So in the decision in order here, the board made the point that to the extent ARC was stating they could not just unilaterally give the 3% increase, if that was actually their concern, they could have offered it to the union. They were negotiating about exactly that at the time, though. The union was asking for 20% or something like that. They were asking for substantially more. But I think another thing here is to the extent that the employer Isn't your response that if the employer had offered 3%, the same amount offered to unrepresented employees, they wouldn't have had an 8A5 problem, right? They would not have had an 8A5 problem. I'm just making sure I'm thinking through this correctly. Right. I mean, if they offer something to the union and the union accepts it, there's no new relationship. In the negotiations. Or outside of, or at any rate. In the negotiations, if they had offered 3%, there wouldn't have been a problem, even though the union was seeking more, right? Right. I mean, that's correct. And sun transportation, for example, is a case where something very similar to that happened. But they could end up, this is why the bargaining, the one thing that's going on with the unrepresented employees, is with the bargaining, they might end up saying, well, we'll offer 3%. Or they could say, we're offering 2% plus some increase in other benefits, health or retirement or what have you. And to infer, I mean, I guess I'm aware the dissenting member, I'll just tell you where I am. And so you can respond to that. The dissenting member said the case for inferring an unlawful motive is barely even colorable. I agree with that. Now, I have to apply a deferential standard, however, to the board. So I'm trying to figure out if barely even colorable, because I agree with that, is enough for me to vote to sustain with the board here. And my problem, and just to show it further, is my larger just analyzing the whole Shell Oil context. It just seems, yeah, they give a raise to the unrepresented employees, and at the same time they're bargaining with the represented employees. The represented employees might get more, might get less. If they tried to use it, I think there's one case here. There's a BF Goodrich. If the grant had been accompanied by statements encouraging the employees to abandon collective representation in order to secure the benefit, for example, we would have clear evidence of unlawful 8A3 motivation. That's not what's going on here. They didn't say stop the bargaining so you can get the 3%. They did not say stop the bargaining so you can get the 3%. But to the extent that we're going to talk about the animus evidence, I mean, they were told you're not getting the raise because you voted the union, you're not getting the raise because we're spending the money for your raise on lawyers to fight union charges. I suppose that's true. Well, that was found to be true. Those statements were found to be true. I mean, it's just a statement of fact, right? It goes beyond a statement of fact, though, in the sense that in looking at the employer's motive, this is blaming the union, the employees who voted for the union, for the fact that for engaging in other protective activity, including voting to authorize a strike, it's blaming those employees for the fact that the raise isn't being given. You said blaming? You said blaming? Yes. Well, isn't it just explaining? There's $56,000 less on the table because we're now bargaining to have lawyers. Well, as counsel already pointed out this morning, I mean, independently, although it wasn't pled as an 8A1 violation, I mean, that's still a conceded violation of the act to tell employees that the money is going for the lawyers, and that's why you're not getting some. Right, but here the question is, does it reflect some animus? Well, the board found that it did reflect animus because not only was it a statement, not only were the statements made by these managers that are attributable to the employer, but they were made, and as the board found, discussing Proulx's motivation. Proulx was going to give you a raise until you voted in the union. Proulx will pat you on the back if you work to get the union out of here. Those statements link directly back to the decision maker in this case, and that's part of the board's animus finding. If you had just that last one, basically you'll get a pat on the back if the union goes away. Just that statement. If you had just that, would that be sufficient? I can't answer for the board on that question, but I can say as if that was the only piece of animus evidence in this case. I'm not clear that that would be sufficient. However, the board relied on many other reasons in this case as evidence of animus, and specifically stated that they were making that finding on the record as a whole, including the pretextual statements, including the timing and the other supervisor statements, which does distinguish this case from other shell oil-type cases where the board found no violation because the evidence of animus was much thinner or perhaps was just a statement of fact as to, for example, in Oroville Camp, which the board discusses, there were proposals going back and forth as to wage increases at the bargaining table. After a proposal had been rejected by the union that was made by the employer, a foreman told employees that it wasn't given, the raise was not given because of negotiations. Now, that's a statement of fact. They had turned down, the union turned down a proposal. It's a statement of fact that that's why it's then not given. Anything else? No. Okay. Thank you. Thank you very much. Mr. Hawley, I think you're out of time, but you can take an extra minute if you'd like. Okay. Thank you, Judge. Just briefly on the pretext, I didn't want to leave that related just to the briefs. On the pretext, there's a suggestion that not wanting to offer 3% at the very beginning of, well, in October, or I'm sorry, in July, was somehow pretextual because we offered, the company offered 1.5% later. There has been a passage of time. The strike vote was taken in August. There was no strike. As we progress down negotiations, the passage of time, which is part of the process, explains why that was offered. And it was offered before the end of the certification year, which, of course, is something that the board was going to look at very closely. And as most people know, when you're negotiating, you always offer about half as much as you're willing to go, 1.5%. With regard to the wage increase going to board, that's simply the managers and supervisors. If you look at the classifications of employees that are listed within that wage increase, you will see professionals, you will see technical employees. It's not just managers and supervisors. It's 110 people. Thank you very much. Thank you. Case is submitted.
judges: Tatel, Kavanaugh, Ginsburg